IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAMES R. WASHINGTON,

                Plaintiff,

v.                                               OPINION and ORDER

MICHAEL DITTMANN, SUE NOVAK,           23-cv-344-wmc
LARRY FUCHS, and TRISH ANDERSON,

                Defendants.

---

      Plaintiff James Washington, who is representing himself and now incarcerated at Green Bay Correctional Institution, is proceeding on Eighth Amendment claims that the warden, two former wardens, and a nurse at Columbia Correctional Institution ("CCI") subjected him to inhumane conditions of confinement and consciously disregarded a substantial risk to his health since May 2017, both by forcing him to forgo exercise and use his limited recreation time for the library.  Defendants have moved for summary judgment with respect to plaintiff's claims.  (Dkt. #42.)  For the reasons explained below, the court concludes that the evidence of record would not permit a reasonable trier of fact to find:  (1) plaintiff's movement was so restricted as to threaten his health; or (2) any of the defendants acted with deliberate indifference to a substantial risk to his health.  In any event, CCI's warden and his two predecessors are entitled to qualified immunity. Accordingly, the court will grant defendants' motion for summary judgment and close this case.

UNDISPUTED FACTS[1]

I.  Background

At all times relevant to this lawsuit, plaintiff James Washington was incarcerated at CCI, where defendants were all employed. Specifically, Michael Dittmann was the warden from March 23, 2014, to July 27, 2018; Susan Novak was the warden from August 19, 2018, to May 23, 2020; Larry Fuchs was the warden from May 24, 2020, to November 14, 2024; and Trisha Anderson was a Nurse Clinician 2 from September 26, 2011, to January 21, 2018. As mentioned, plaintiff was subsequently transferred to Green Bay Correctional Institution on April 19, 2024, where he is currently housed.

II.  Relevant DOC Policies and Practices

A.  Library and Recreation Scheduling

The Wisconsin Administrative Code requires that prisoners be given access to at least four hours of "leisure time activity" per week, which encompasses time for sports and other recreational activities, such a reading, crafts or watching television. Wis. Admin. Code § DOC 309.36. During their respective tenures, CCI Wardens Dittman, Novak, and Fuchs complied with that requirement by providing inmates with at least four hours of

---

[1] Unless otherwise indicated, the following facts are material and undisputed for purposes of summary judgment. The court has drawn these facts from defendants' proposed findings of fact and plaintiff's responses, as well as the underlying evidentiary record where appropriate, viewing them and all reasonable inferences in a light most favorable to plaintiff. *See Miller v. Gonzalez*, 761 F.3d 822, 877 (7th Cir. 2014) (At summary judgment, the court must "construe the record in the light most favorable to the nonmovant and avoid the temptation to decide which party's version of the facts is more likely true.").

leisure time activity per week, subject to staffing and security constraints. Inmates are allowed to choose among different leisure activities, and they can leave their cell or do in-cell exercises. If an inmate had a medical restriction for a different schedule or additional recreation time, defendants expected staff to honor that medical restriction as well.

On April 3, 2017, Deputy Warden Kalen Ruck (who is not a named defendant) issued a memorandum explaining that recreation and the use of the library would be scheduled at different times, so that inmates could now attend both. Further, on May 12, 2017, the CCI librarian, Ms. Troemel, issued a memorandum explaining that due to space constraints at CCI, inmates would be limited to two, *extra* sessions of library time per week, and would only be eligible for an extra session *after* first using all of that inmate's regular library time. Between May 2017 and the filing of this lawsuit, plaintiff regularly, but not constantly, received passes for extra library time to meet court-ordered deadlines.

Recreation and library times were slotted by housing unit, so availability depended on where the inmate was housed on any given day. Moreover, scheduling these times is subject to continuous revision by housing unit supervisors or other security staff and does not require the warden's approval. Over time, plaintiff in particular had been assigned many different housing unit at CCI, including occasional placement in disciplinary segregation. In addition, from April 2, 2017 through March 5, 2019, and April 22, 2022 through August 10, 2022, plaintiff was assigned full-time as a housing unit worker, performing tasks such as cleaning, laundry, and serving meals under the supervision of correctional staff and the housing unit manager.

Because of the Covid-19 pandemic, many administrative rules were suspended during 2020 and the first half of 2021, including those affecting leisure and other activities.

While inmates had access to the library and recreation during the pandemic, these schedules were varied further. For example, on November 5, 2020, Deputy Warden Olson (also not a named defendant) issued a memorandum instructing that inmates "will be scheduled for Law Library and Extra Law Library based on current Unit Recreation schedules; this means [inmates] will attend either Law Library or Recreation." (Dkt. #45-10.) However, inmates with court deadlines within 30 days were still allowed to request extra library time. Then, in early 2022, Warden Fuchs instructed the librarian to schedule library time for specific housing units at a different time than the recreation time for that unit, where possible and subject to the volume of requests for the library. This remained the practice through Fuchs's time as warden, which ended in November 2024.

### B. Medical Restrictions and Special Needs

In 2017, Department of Corrections ("DOC") Health Services Policy No. 300:07, regarding the process for the determination of medical restrictions and special needs, required all DOC facilities to establish a "Special Needs Committee" to address requests for special needs and restrictions." (Dkt. #45-6, at 2.)[2] The committee independently reviews special needs requests received from inmates and makes a recommendation based on their role. Similarly, the facilities "[p]rescribing practitioners shall refer items to the committee/nurse for review of special needs rather than write orders for specific items." (*Id.*) Thus, the committee ultimately determines whether an inmate requires a medical

---

[2] Rather than forming a formal committee, the policy alternatively allows a facility to assign this task to a specific nurse and security liaison, but there appears no dispute that CCI put a Special Needs Committee in place.

restriction or special need based upon medical necessity. The committee is comprised of one or more staff representatives from the Health Services Unit ("HSU"), a staff representative from security, and a non-security staff representative, with the HSU representative in particular reviewing the inmate's relevant medical records to determine if the item or action requested is medically necessary. Between May 2017 and April 2023, however, there were no provisions in DOC's Health Services policy regarding special needs and medical restrictions for extra recreation time.

### C. Medical Records

The DOC now uses the Wisconsin Integrated Corrections System ("WICS"), which is an electronic platform for inmate records, including offense details, housing, movement, inmate banking, conduct reports, incident, reports, restrictions, and more. However, in 2017, DOC's medical records were still on paper and nursing staff filled out a paper form with the information that would be sent to the inmate's housing unit. In turn, security staff on the unit entered the restriction into WICS, which contains a "Special Handling Summary" with information about an inmate's housing recommendations (i.e., assignment to cell types, tier/bunk positions, etc.); security recommendations (i.e., risk of victimization/assault, special placement needs, etc.); ADA accommodations; and medical restrictions. Because all security staff have access to this Special Handling Summary, this is how medical restrictions were communicated to them even in 2017. While the Special Handling Summary may identify *who* entered or discontinued restrictions, or *when* notes were made in the system as of a particular date, WICS does not contain any *additional* information beyond what appears on the summary itself.

### III.    Plaintiff's Medical Treatment and Restrictions

On May 31, 2017, Dr. Syed saw plaintiff for complaints of right thigh pain. Plaintiff told Dr. Syed that he could not go to recreation because he had to go to the library, so Dr. Syed entered a prescriber's order stating: "pls let pt exercise/use his recreational pass on alternate days to exercise." (Dkt. #44-1, at 68 and 76.) That day, a medical restriction was then entered into WICS stating, "Order from Dr. Syed (5/31/2017): Please let patient exercise/use his recreational pass on alternate days to exercise." (Dkt. #45-1, at 8.) This restriction remained in effect until May 31, 2018.

Plaintiff's medical records then show that two additional restrictions were entered into WICS:

- June 2, 2017: "please let pt exercise, use his rec/pass or alternate days to exercise." (Dkt. #45-1, at 3.) This restriction ended one month later, on July 2, 2017.

- July 5, 2017: "Patient may alternate his rec privilege with access to law library per Dr. Hoffmann until 01/05/2018." (*Id*. at 5.)

However, Nurse Anderson discontinued the July 5 restriction in WICS, noting that: "no order to support above restriction. Restriction dated 5/31/2017 states 'patient may alternate exercise pass for exercise.'" (*Id*.) In particular, according to Anderson, there was *no* prescriber's order or progress note from Dr. Hoffmann stating that plaintiff may alternate his recreation privilege with his access to the law library through January 5, 2018. Indeed, she was only able to locate Dr. Syed's original May 31, 2017, order.

Between June 2017 and April 2023, plaintiff was seen by medical providers at CCI on more than 30 occasions. While he regularly raised the issue of needing additional recreation at these appointments, no provider ordered that plaintiff engage in a specific

6

number of hours of exercise or be granted a medical exception to the recreation schedule. In fact, the Special Needs Committee denied plaintiff's request for extra recreation on September 1, 2021, finding that plaintiff did not meet the criteria for one. Further, between May 20 and June 3, 2022, plaintiff was restricted to "no recreation," except walking the track.

### IV. Plaintiff's Actual Recreation Attendance

Plaintiff's medical records also contain various references to him attending recreation or exercising:

- On January 9, 2018, plaintiff refused to be assessed for a wrist injury at recreation.

- In December 2021, plaintiff reported that he was walking at recreation. Plaintiff says that this was a rare opportunity when the library was closed.

- In April 2022, plaintiff reported that he was focusing on cardio by walking on the treadmill on an incline but intended to start lifting weights at recreation.

- On May 23, 2022, plaintiff's Special Needs Evaluation for a medical mattress noted that he was able to ambulate on a treadmill and outside.

- On September 19, 2022, plaintiff was seen in HSU after he injured his knee while working out in his cell.

- On February 1, 2023, Physical Therapist Bothfeld, who was treating plaintiff's knee and shoulder pain, noted that plaintiff "has been attending rec but hasn't initiated any strength training yet as he is focusing on riding the bike/walking on the treadmill." (Dkt. #44-1, at 93.)

- On March 21, 2023, Bothfeld noted that plaintiff "attends rec regularly mostly focusing on riding a seated exercise bike for aerobic exercise." (Dkt. #44-1, at 369-73.)

7

OPINION

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-07 (7th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In deciding whether to grant summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party, *Anderson*, 477 U.S. at 255, and construing the filings of unrepresented parties like plaintiff generously, *see Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001).

However, summary judgment has been repeatedly referred to as the "put up or shut up" moment for parties seeking to take their claims to trial, at least in the Seventh Circuit. *Johnson v. Cambridge Indus. Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted). Specifically, plaintiff must "do more than simply show that there is some metaphysical doubt as to the material facts"; he must respond to defendants' showing of a lack of material disputes of fact by designating specific facts in affidavits, depositions, answers to interrogatories or admissions that establish there is a genuine triable issue. *Anderson*, 477 U.S. at 256-57, 261. Because those facts must be admissible at trial, plaintiff may not rely on inadmissible hearsay, speculation, or conclusory allegations to defeat summary judgment. *See Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023); *Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999). Finally, a factual dispute can preclude summary

8

judgment only if the facts "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

Plaintiff's claims regarding his alleged inability to exercise arise under the Eighth Amendment, which imposes upon prison officials the duties to provide "humane conditions of confinement" for prisoners, including adequate shelter, protection, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Henderson v. Sheahan*, 196 F.3d 839, 844 (7th Cir. 1999) (citations omitted). However, not every injury or deprivation suffered by a prisoner translates into constitutional liability. *Id*. Instead, only a prison official's deliberate indifference to a prisoner's substantial risk of serious harm violates the Eighth Amendment. *Farmer*, 511 U.S. at 828. To prevail on his Eighth Amendment claims, therefore, plaintiff must establish that he suffered objectively serious harm *and* that defendants knew about a substantial risk of that harm yet failed to take reasonable measures to prevent it. *Henderson*, 196 F.3d at 845 (describing objective and subjective components of Eighth Amendment claims).

"A deprivation of exercise that prison officials expect will likely result in severe health problems may violate the Eighth Amendment, unless the deprivation is proportionate to a legitimate penological purpose." *Pyles v. Spiller*, 708 F. App'x 279, 281 (7th Cir. 2017) (citing *Turley v. Rednour*, 729 F.3d 645, 652 (7th Cir. 2013); *see also Delaney v. DeTella*, 256 F.3d 679, 683-84 (7th Cir. 2001) (prisoner denied all out-of-cell exercise opportunities for 6 months during lockdown stated Eighth Amendment claim)); *Anderson v. Romero*, 72 F.3d 518, 528 (7th Cir. 1995) ("[E]xercise is now regarded in many quarters as an indispensable component of preventive medicine."). Still, to "rise to the level of a constitutional violation," the deprivation of exercise must be significant, such as "[w]here

9

movement is denied and muscles are allowed to atrophy[] [and] the health of the individual is threatened.'" *Smith v. Dart*, 803 F.3d 304, 313 (7th Cir. 2015) (quoting *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985)); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996) ("Lack of exercise may rise to a constitutional violation in extreme and prolonged situations where movement is denied to the point that the inmate's health is threatened.").

In *Smith*, the Seventh Circuit explained that "there is a significant difference between a lack of outdoor recreation and an inability to exercise" inside his cell or in jail common areas. *Id*. Indeed, "the court must consider exercise time together with other out-of-cell time (such as dayroom time) when determining the adequacy of recreation time under the Eighth Amendment. *Gross v. Boughton*, No. 16-cv-759-wmc, 2019 WL 6728273, at *9 (W.D. Wis. Dec. 11, 2019). In *Gross*, therefore, this court held that plaintiff's 3 hours and 30 minutes of exercise time and 6 hours of dayroom time, per week, passes constitutional muster." *Id*. With *Gross* as a guide, the court considers plaintiff's Eighth Amendment claims on the merits, as well as defendants entitlement to qualified immunity. In doing so, the court will address the parties' arguments with respect to the wardens and Nurse Anderson separately.

I. **Wardens Dittman, Novak, and Fuchs**

Plaintiff bases his claims against Wardens Dittman, Novak, and Fuchs on their continued enforcement of the library use policy, despite their knowledge that the policy led to health complications for plaintiff. Specifically, plaintiff contends that he was forced to choose between going to recreation or the library in order to receive extra library time

10

for court deadlines because of defendants' decision to require inmates who desire additional library time to use all of their available law library time in lieu of other forms of leisure activities. Unfortunately, plaintiff has failed to present *evidence* from which a reasonable jury could find that the wardens' policy or its enforcement resulted in such a severe deprivation of exercise as to threaten his health. In fact, plaintiff has not even demonstrated that he was denied *all* access to exercise or movement for prolonged periods of time, much less that he was denied exercise ordered by a medical provider. Most broadly, plaintiff has not even presented evidence clearly establishing that he was unable to get *any* exercise for extended and uninterrupted periods. At most, plaintiff has shown that he did not get as much exercise as he desired because he *chose* to go to the library instead of attending his allotted recreation period when under court-ordered deadlines.

Indeed, it is undisputed that plaintiff was generally provided with at least four hours of recreation time per week during the relevant period, along with separate times for using the library. Even during the pandemic -- when inmates had to choose between recreation and the library for health and safety reasons -- the evidence is that plaintiff had the opportunity to engage in *both*. While plaintiff regularly chose to forgo his recreation time in order to gain *additional* hours in the library, he also does not dispute that he was able to engage in various forms of physical activity and movement both in and outside of his cell from 2017 to the present.[3]

---

[3] While plaintiff suggests that this additional library time is guaranteed by his constitutional right to access the courts, this is not the case. *See Martin v. Davies*, 917 F.2d 336, 338, 340 (7th Cir. 1990) (inmates entitled to reasonable but not limitless library access). In any event, plaintiff did not plead and was not allowed to proceed on a claim that he was denied access to the courts, because at most, he was allowed to vindicate that right at the expense of some of his recreational time.

11

Moreover, as defendants argue, plaintiff failed to present any evidence establishing that he required a *specific amount* of exercise or recreation time as part of his medical treatment, nor that any of his conditions were made worse or even affected because of any additional exercise plaintiff was or was not getting. Rather, in support of his argument that he was deprived of the opportunity to exercise to the point that it harmed his health, plaintiff points to Dr. Syed's "recommend[ation of] regular exercise" and issuance of "a prescriber's order because the defendants were forcing him to forfeit all of his recreation periods to attend law library because you could not do both." (Dkt. #58, at 16.) However, Dr. Syed's 2017 order *only* required that plaintiff use his recreational pass on alternate days to exercise; it did not eliminate or modify the CCI policy requiring him to use all other available library time before requesting extra library time for a given week, nor did it contain any specific amount of exercise time. (*See* dkt. #59, at ¶¶ 16-18.)

If anything, a fair reading of plaintiff's medical records show that despite his regular complaints to medical providers and physical therapists about needing extra recreation time, no medical provider (other than Dr. Syed) recommended or ordered a specific amount of exercise for him. In fact, CCI's Special Needs Committee considered plaintiff's request for recreation time in addition to his maximum-allowable library time in September 2021, but determined that plaintiff did not meet the criteria for such a request. While plaintiff argues that the warden defendants should have known about the ill effects on his health from the grievances he submitted, plaintiff presented only his own opinion about what level of exercise was required. In the absence of a medical opinion or recommendation to the contrary, the wardens had no reason to believe that plaintiff required exercise in

12

addition to that he was already being offered, nor could a lay jury have a basis to infer reasonably that the amount allowed presented an objectively serious harm to plaintiff.

Finally, because defendants have raised a qualified immunity defense, plaintiff must also show that defendants violated clearly established law, which means that the law was sufficiently clear at the time of the alleged violation that a reasonable official would understand what he or she was doing violated the Eighth Amendment. *Tousis v. Billiot*, 84 F.4th 692, 698 (7th Cir. 2023). Plaintiff can prove this in one of three ways: (1) point to a closely analogous, binding case that established a right to be free from the type of action the defendants performed; (2) identify a clear trend in the case law showing that the recognition of the right by controlling precedent is merely a question of time; or (3) show that the defendants' conduct was "so egregious and unreasonable that no reasonable official could have thought he was acting lawfully." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 620-21 (7th Cir. 2022) (citations omitted). Plaintiff has not cited, and the court has not located, any authority suggesting that plaintiff's access to out-of-cell recreation time fell below the standard required by the Eighth Amendment. To the contrary, the cases discussed above, including the Seventh Circuit's *Davenport* decision, suggest that plaintiff's available recreation time per week, particularly counting both in-cell and out-of-cell time for exercise and movement, passes constitutional muster. Further, because plaintiff cannot point to any Supreme Court or controlling circuit precedent establishing that he was entitled to *more* recreation time to obtain *additional* library passes, defendants' qualified immunity defense succeeds here.

## II. Nurse Anderson

Plaintiff's claim against Nurse Anderson is based on an allegation that she disregarded a substantial risk to his health by rescinding a medical restriction for an invalid, non-medical reason. However, the undisputed record establishes that Anderson removed only one restriction -- the one entered on July 5, 2017, and ending January 5, 2018 -- because there was *no* prescriber's order supporting it. Specifically, Anderson avers that after being unable to locate a medical order supporting the restriction entered in WICS, she clarified what restriction was called for based on plaintiff's medical records to ensure the restriction in place reflected the wording of a prescriber's order. In doing so, Anderson discovered that, while *Dr. Syed* had previously issued a restriction on May 31, 2017, it expired as of May 31, 2018, and there was *no* evidence supporting any extension, particularly not one issued by *Dr. Hoffman* for an *additional* restriction between July 5, 2017, through January 5, 2018.

Moreover, even if Anderson was wrong about the lack of an additional order, a mistake alone cannot support a claim for deliberate indifference. *See Whiting v. Wexford Sources*, Inc., 839 F.3d 658, 662 (7th Cir. 2016) ("It's clear that evidence of medical negligence is not enough to prove deliberate indifference[,]" and even "a mistake in professional judgment cannot be deliberate indifference."). Regardless, the evidence also shows that the same restriction issued by Dr. Syed *remained* in place throughout and subsequent to the July 5, 2017, to January 5, 2018, period. Because the evidence of record would not permit a reasonable trier of fact to conclude that defendant Anderson failed to

take reasonable measures in response to plaintiff's serious mental health needs, therefore, she is also entitled to summary judgment on the merits of plaintiff's claim against her.[4]

ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Trish Anderson, Michael Dittman, Sue Novak, and Larry Fuchs (dkt. #42) is GRANTED. The Clerk of Court is directed to enter judgment in favor of defendants and close this case.

Entered this 9th day of February, 2026.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge

---

[4] The court need not address Anderson's qualified immunity defense, both because it is unnecessary and because plaintiff's rights in this regard are clearly established. *See Estate of Clark v. Walker*, 865 F.3d 544, 551-51 (7th Cir. 2017) (collecting cases articulating constitutional right to be free from deliberate indifference to a serious medical need).